26015. ADAMS v. THE STATE.

ARGUED SEPTEMBER 15, 1970—DECIDED OCTOBER 8, 1970.

*Robert B. Thompson*, for appellant.

*Jeff C. Wayne*, District Attorney, *Arthur K. Bolton*, Attorney General, *Harold N. Hill, Jr.*, Executive Assistant Attorney General, *Marion O. Gordon*, *William R. Childers, Jr.*, Assistant Attorneys General, for appellee.

UNDERCOFLER, Justice. Riley D. Adams was indicted by the Dawson County Superior Court for the murder of Herman P. Gilder on January 28, 1970. He was convicted and sentenced to

life imprisonment. A motion for new trial on the general grounds was overruled and the exception is to that judgment.

The evidence shows that Herman P. Gilder was a building contractor and the defendant had done some work for him. In March 1969 the defendant borrowed an amount of money from Gilder and signed a promissory note for $3,800 due September 15, 1969. The note became past due and the defendant promised to pay it by cashing certain church bonds. However, later he stated that he did not have the money to pay the debt. He told Gilder and his wife that he would receive $4,900 from the government for setting out pine trees during the first part of 1970 and would pay the debt then. When it was not paid, the defendant told Gilder and his wife that there was a check in Dawsonville, Ga., for $4,900 for the trees and he wanted Gilder to go with him to Dawsonville to obtain these funds because the government would not release the check unless the property was clear. Gilder, his wife, daughter and the defendant on a Saturday morning went to Dawsonville but were unable to obtain the check because the office was closed. The defendant told Gilder that they would have to return on Monday when the office was open. After several more delays, the defendant came to Gilder's home about 8:30 a.m. on Wednesday, January 28 and he and Gilder left for Dawsonville to obtain the check. The defendant returned about 12 o'clock that day and told Mrs. Gilder that he and her husband had gone to the subdivision in Gwinnett County where Gilder was building houses and when they arrived, they found cement sacks and windows broken; that her husband wanted her to take some polyethylene to the subdivision to protect the property and bring him home; and that he wanted her to write the defendant a check for $316 as the amount due him after the defendant had turned over the government check to Gilder. Mrs. Gilder tried unsuccessfully to contact her husband by telephone at the construction site. She wrote the check for $316 and gave it to the defendant but requested that he not cash it until the next day in order that she could make certain that sufficient funds were in the account to pay it. She drove to the subdivision site where she failed to find any broken cement sacks and windows. She searched the houses

at the site and made other attempts to locate her husband. She was unsuccessful in locating him, returned to her home, and called the Atlanta police. Her husband had $1,650 pinned to the breast pocket of his suit when he left home in order to pay the difference between the debt and the $4,900 check. After she talked with the police, she called the defendant about 4 o'clock p.m. that same day at his place of employment and asked him to go with her to point out the location where he had left her husband. He never appeared and several hours later she was told that he could not get off work. About midnight she and four relatives went to the defendant's place of employment to wait for him to finish work. After he completed his work, the defendant went to his car, took a package from it and gave it to another man who put it in his car. They recorded the tag number of the other man's car and later gave it to the police. They followed the defendant home. Whereupon Mrs. Gilder and one of her relatives asked him to go with them to find her husband. The defendant went with them but was unable to direct the driver to the construction site. Mrs. Gilder gave the directions. When they reached the site where the defendant had said he left her husband, the defendant directed them to a different house from the one previously described to the wife. They found neither broken windows nor broken cement sacks.

Lt. J. R. Shattles, an Atlanta police officer, testified that on Thursday, January 29, 1970, at 10:30 a.m., he received a missing person's report on Gilder. Since the defendant was the last person to see him, he talked with him about 11 o'clock that morning. After being advised of his constitutional rights, the defendant told him that he and Gilder left Atlanta about 8:30 a.m. on Wednesday and went to Dawsonville to get some money from his sister who owed him $3,995; that he was going to pay Gilder the $3,800 he owed him; that they got the check from her; that he endorsed it and gave it to Gilder who stated he did not have any money but would give him a check for $195 when they returned to Atlanta; that Gilder told him he needed to go by his construction site to check on his houses; that when they arrived at the site, Gilder got out of the car first and the door handle came off; that Gilder walked over to some cement sacks stacked

on wood and stated that children had been playing there and had broken the sacks; that while he was fixing the door handle, he heard Gilder say some windows were also broken; that Gilder told him to go to his home and tell his wife to bring polyethylene to cover the windows and cement because it was going to rain; that he had already paid $120 on the loan and with the $195 due him as the difference between the check obtained from his sister and the debt, Gilder owed him $316; that Gilder told him to get a check from his wife for $316 when he went by there to deliver the message; that Mrs. Gilder asked him to wait until the next day to cash the $316 check but he needed the money to pay for some groceries and he cashed the check that day; that he returned to his home and went to work; and that he was unable to leave work when Mrs. Gilder called him. Lt. Shattles went to the construction site described by the defendant but found neither broken cement sacks nor broken windows. Later Mrs. Gilder called him and told him about the package the defendant delivered in the parking lot at his place of employment and gave him the tag number of the receiving car. The car was traced to Jerry Wright who, in the defendant's presence, told him that the defendant had given him a package containing a sawed-off, 16 gauge shotgun and shells; that the defendant wanted him to take the gun home with him; that since Gilder had disappeared the gun might draw suspicion to him, and he did not want to have it with him; that about 45 minutes after the defendant arrived at work on that day, he asked Wright to say that he was with him that morning from 9 to 12 o'clock, and that they had been riding around together. On Friday morning, the defendant told the witness that he had lied about the check and the fact that he had left Gilder at the construction site in Gwinnett County. He then stated that they had gone to Dawsonville and picked up the check from his sister; that thereafter they went to look at some mountain property; that Gilder asked him to stop at the next place of business so that he could use the rest room; that since there was no business in the area, they stopped on the side of the road; that Gilder got out on the passenger's side of the car and was standing with the door open; that while Gilder was standing outside the car with the door

open, he started to get out on the driver's side of the car; that it was cold and he reached for his heavy coat lying on the front seat; that the coat was folded and his .41 caliber Colt revolver was lying in the fold; that when he pulled his coat out of the car, the pistol either hit the steering wheel or dropped and hit the floorboard, discharged, and struck Gilder; that Gilder was slumping and he tried to hold him through the car and realized that he could not do so; that he released him and ran around the front of the car and supported him but Gilder's feet began to slide out from under him and he had to let him go; that he appeared to have stopped breathing; that his body rolled down the embankment when it was released; that he drove about a mile down the highway, returned to the scene, checked the body and found that Gilder was dead. The body was found about 15 or 20 feet down a steep embankment. The defendant told him he did not call the police because he was afraid; that he got the money from Mrs. Gilder because he needed it; and that he destroyed the check for $3,995 obtained from his sister.

Dr. Larry Howard of the State Crime Laboratory examined the body of Gilder at the funeral home. He found a bullet wound in the right side of the back of the head which caused his death. The wound penetrated the brain and skull and lodged under the skin in the area of the left temple. The path of the wound was parallel with the ground. He examined the 41 caliber Colt revolver turned over to him by the police. The gun had a faulty hammer block, and he testified that if it fell on the rear of the hammer with sufficient force, it could drive the hammer and firing pin into the bullet and discharge it. If the gun were dropped on the hammer at any level of about 3 feet on a hard surface or 4 feet on a floorboard with a rubber or soft mat, it would discharge. If the gun were dropped on the hammer from a car seat, the distance would not be sufficiently high to cause the hammer to move forward. In the uncocked position, the only way the gun might hit and fire would be to drop it on the hammer. The bullet could not be discharged from the gun in a horizontal angle if it were dropped. Thirty pounds of force applied against the hammer would cause it to discharge also.

Agent R. C. McCracken of the Georgia Bureau of Investiga-

tion took photographs of the body which was lying at the foot of an embankment in Dawson County. He found the trousers of Gilder were unzipped, his back pocket turned inside out, and $1,650 hidden in the breast pocket of his coat. The defendant told him almost the same facts that he last had told Officer Shattles except that he stated he went back through Dawsonville, picked up a hitchhiker, went to his sister's place of employment, obtained a check for $3,995, later let the hitchhiker out of the car, and then destroyed the check. The .41 caliber Colt revolver was recovered at the home of the defendant.

The defendant testified that when the deceased got out of the car on the side of the road, the deceased said, "look at a forked tree" or "look how the tree is made"; that his car had carpet on the floor; that when he pulled his coat out of the car, it discharged but he did not know where it "landed"; that he saw Gilder slump and knew he was shot; that Gilder's hand was on top of the window area of the right front door and slid down the glass; that he tried to hold him through the car, but could not; that he went around the car to support him and his feet were 3 or 4 feet down the embankment and his body in a cross position; that he could not hold him, and he rolled down the embankment; that he left the scene in his car and shortly returned to see if Gilder might still be alive; that he did not go through the deceased's pockets; that he drove away and picked up a hitchhiker, went to his sister's place of employment, got the check for $3,995, told his sister the hitchhiker was Gilder, let the hitchhiker out of the car, destroyed the check and scattered it along the highway; that he asked Jerry Wright to say that he was with him on that Wednesday morning because he was afraid that the police would know he had the shotgun in the car; and that he did not tell the Gilders that he was due a government check in the amount of $4,900.

There is no merit in this appeal and the trial court did not err in denying the appellant's motion for new trial on the general grounds.

*Judgment affirmed.   All the Justices concur.*